On the case 1-4-6191, Melissa Wilson et al. v. Darin Gordon et al. Oral argument not to exceed 15 minutes per side. Michael Kirk for the appellant. Good morning, Your Honors. Michael Kirk on behalf of the officials of the State of Tennessee who are defendant appellants. Judge Moore, if I could have five minutes for rebuttal? Yes. Thank you, Judge Moore, and may it please the Court. If ever a case called out, cried out, for application of the passive virtues, it's this case. The merits issue is an important question of first impression that would require the Court to reconcile provisions of the Affordable Care Act and the Medicaid statute that go to the respective responsibilities of the states and the federal government in the administration of the Medicaid program. It's not necessary to decide that statutory question in this case, and indeed, it may never be necessary to decide it. The new regime is still very much a work in progress, and the facts on the ground have changed significantly since the district court had this case last summer. Most importantly, since the district court ruled, CMS has begun providing the state with data on the problem applications that have been hung up in the federal exchange that enables the state, with some assistance from applicants, to resolve those applications. And the state is committed, as a matter of policy, to continue working with CMS and with applicants in Tennessee to ensure that those consistencies get resolved and when individuals are eligible to enroll them. Now, it's undisputed that the plaintiffs in this case, the claims of every single one of them, became moot prior to the entry of the preliminary injunction and, most importantly, prior to the time when the class was certified. What should we do about the reality that, as I understand it, the U.S. Supreme Court has granted review of, I think, this precise issue in Campbell-Uwald, and I guess two questions. One is, is it the same issue? Number two, what are your clients' preferences? I'll be curious what the other side says in terms of whether to hold the case in abeyance, assuming there is an overlap between the issues. Let me ask your number two first. We have a strong preference that you decide the case. The continuation of the preliminary injunction, which the state is complying with, is causing a real drain on the state's resources in an area that we think is not to the best interest of solving the overall problem. We would like to divert the resources that have been put into this appellate process that the injunction requires and put them all into resolving the underlying problem of the delayed applications. In answer to the first part of your question, Judge Sutton, in the Campbell-Uwald case, the court granted three questions, two of which are jurisdictional. The first one, which could decide the matter, has nothing to do with our case at all. It's whether or not when a defendant makes a Rule 68 offer that is rejected by the plaintiffs in a damages case, whether that moots the individual plaintiff's case. Only if the court answers that in the affirmative do they get to the second question, which arguably does impact this case, and that's whether, assuming the underlying plaintiff's case is moot, does that mean that the class certification falls? I acknowledge that there is some possibility that there could be initial guidance, but even if they get to the second question, Judge Sutton, in the Campbell-Uwald case, there is some possibility that it could go off on a critical distinction that this case has from that, and that is, in that case, the plaintiffs refused. They did not accept the Rule 68 offer, whereas here the plaintiffs agreed with and participated in the actions that led to the mooting of the case. I mean, just a practical consideration. I understand your point, particularly the way you answered the first one, the first issue. But the practical consideration is the losing party here is not going to say, okay, fine. The losing party is assuredly going to seek cert on the hopes that Campbell-Uwald comes out their way and forces a reconsideration by us, and that's going to lead everybody to stay in that. Now, it's true. I suppose you could say we shouldn't stay our decision pending cert and all that stuff, but I'll bet your position on that you're not ready to commit to because you don't know whether you're going to win or lose. Well, let me commit to this, Judge Sutton. Obviously, if we win, I'm going to be happy. But also not going to think we should stay it if the other side says we ought to stay this pending what happens. And here's why I would tell you not to stay it if I win. The clearest path to a mootness ruling in my favor is the voluntary relinquishment path. Campbell-Uwald has nothing to do with that because the plaintiffs there refused the Rule 68 offer. So I would say if I win on Petrie and voluntary relinquishment and Rupert, the Eighth Circuit's decision in Rupert, which is directly on point here, even if the Supreme Court comes out the other way on Question 2 in Campbell-Uwald, that doesn't affect this case. I still win because this is a voluntary relinquishment case. That's a plaintiff's refusing the offer case. Did they relinquish everything? They did not, Your Honor, relinquish the claim for attorney's fees, which I think is where you're going with that. And my answer to that is twofold. Number one, I think if you look at Petrie, there were two grounds that the court carefully covered. One was the voluntary relinquishment ground. And then they said wholly apart from that, those plaintiffs still have a claim for attorney's fees. And the plaintiffs have argued that Petrie is distinguished on that. And I would say both of those were all but independent grounds. Second point, the Rupert case from the Eighth Circuit that I just mentioned in response to Judge Sutton's question. In that case, they squarely took on the, well, we still have an attorney's fees claim left. And the Eighth Circuit, following Rhodes and citing this court's decision in Petrie, said that doesn't matter. You voluntarily relinquished your claim. Are there any cases going the opposite of Rupert? There are, I think, three circuits. I've got one other circuit. There are a number of circuits going the other way. I think right now the score is three to three, depending on how you count. On my side, I've got Rupert. I've got the Fourth Circuit and Rhodes. And I would say I have Petrie, although one could argue because there were two grounds of decision there. And obviously Petrie is binding on this court. On the other side are the earlier decisions from the, I think it's the D.C. Circuit in the Richards case, the Seventh Circuit in the case whose name I'm forgetting, and I believe it was a case called Turlington-Rhodes. And these are all cited in the briefs from the Eleventh Circuit. All three of the cases on the other side passed over this issue with lightning speed. I acknowledge that they came out the other way, but I would say that the reasoning of Petrie, the reasoning of Rupert, and the reasoning of Rhodes is far more persuasive because what those courts focused on is this. Any plaintiff who voluntarily relinquishes her claim on the merits, by definition is someone who cannot present the sharp adversarial conflict that Article III requires. But you say they voluntarily relinquished their claims. In what way? They gave information and then you chose to give the hearings. No, that's not quite accurate, Judge White, and let me explain exactly what happened. They entered an agreement with the state under which consideration flowed both ways. The state got extra time to respond to their pending motions, and in exchange the state agreed that if it got information from CMS about their applications, because remember the state didn't have their applications, and if the plaintiffs themselves provided income information to resolve the inconsistencies, the state would adjudicate the applications. Both sides did what they agreed to, and the result of that agreed shared enterprise was that their cases were mooted. This applies, though, to the named plaintiffs and to there were something like 100 people who were specifically identified, but the class was certified and there are many other members of the class. Is that right? Tell me where I'm wrong. Let me make sure I get you in chronological order on that, Judge Moore. The agreement was the named plaintiffs plus up to 100 additional people that the Plaintiffs' Council identified by name. At that point the class wasn't certified. Then the class gets certified, and there are other people who are not within the 100 that are in the class. And if I could just briefly touch on the merits. But you didn't appeal the class certification issue, right? So that's not in front of us. We did not appeal the decision certifying the class, but the timing of the class certification is directly relevant to the district court's jurisdiction to enter the preliminary injunction and this court's ultimate jurisdiction to reach the merits. The one area that I was concerned about was whether we would be able to address this under the inherently transitory exception. Let me address that, Your Honor. The Supreme Court, in the Genesis case, reaffirmed that the inherently transitory doctrine only applies when the district court would not have time between the filing of the complaint and mootness to certify the class. So that's your test. Is there enough time to hear class certification and decide class certification before it becomes moot? And this arises most prominently in the weekend detention cases where the case will be moot by Monday morning. In this case, we know that there is more than enough time for a case to arise and not be mooted before class certification is done because Judge Campbell certified the class 41 days after the complaint was filed, yet if you look at the complaint and you look at Judge Campbell's opinions, there were allegations of delays of up to, I think, five to seven to nine months. So this simply does not fit within that very narrow doctrine. And the underlying reason for limiting the doctrine that way, Your Honor, is the class certification line itself is an exception to the strict rules of mootness that arises out of SOSNA. And it's basically the notion that class certification is a moment when a new legal entity that itself might have claims comes into existence. If that entity never could have come into existence or in the case of situations like Roper and Garrity, it did come into existence but the district court erroneously didn't recognize it by erroneously denying the class certification, there are narrow exceptions for that. This is none of those cases. Thank you very much. Go ahead, Judge William. So the class was certified after all of those people's claims were resolved? Let me be specific. The class was certified after all of the named plaintiffs and I think most but maybe not all of the hundred other people that we agreed to work on. And since that time, obviously, thousands of class members have had their claims mooted as the state has embarked on the new process with CMS to work through these problem cases. And I presume that more class members have come into existence too. That's possible but it's unclear. There's nothing on the record to support that. And the reason why I say it's possible, Your Honor, is, again, after the district court ruled in September, CMS began providing the state, and this is in the record, there's declarations to this effect, with information on a comprehensive basis in the so-called flat files that I think are described in the United States brief and described in the declarations that we put in. And that information, which we didn't have before suit was filed, has allowed the state to set up a process for people who run into this problem at the exchange. The exchange is unable, as the United States acknowledged in its brief, to handle these inconsistency cases. Because the information goes to the state, the state now has a process where it reached out to these individuals, it now knows they exist, and to the extent it needs income stubs or something, it requests that and their claims get resolved. So we don't know if there's anyone else. Just one real quick question. I was wondering, I think it was raised below, where's the right of action come from here? Is that just something that people are waiting for final judgment on? I mean, I just was a little puzzled. When you start to look at the statute, you're wondering how is this the case? Your Honor, we did raise the question below, and we're certainly preserving it. We chose not to include it in this appeal primarily because I think the argument is much tougher given that they have a due process claim. If it had just been you violated the 45-day regulation. I got it. Thank you very much. Thank you, Your Honor. Good morning, and may it please the Court. My name is Sam Brooke, and on behalf of the plaintiff, what I would like to do this morning is first focus on the merits arguments, then briefly touch on Rule 19, and then finally focus on mootness. But, of course, I'd be happy to take that in a different order. Do you have just a quick response to the question of whether to hold the case in abeyance? Is your preference to march ahead with a ruling or wait for the Supreme Court? Well, of course, we'd be thrilled to have the case held in abeyance because the preliminary injunction is in effect and granting the relief that we need. So that would be our preference, but we're also fine with moving forward. As I'll discuss with Petrie, we don't think that Petrie applies here at all, and thus we, of course, think that we should prevail in finding that the case was not moot. And, you know, let me just start there with mootness and with the voluntary relinquishment argument. I mean, the Petrie case, it's critical to understand that this Court, when it was talking about Petrie, and this is at page 703 of the opinion, the plaintiffs had entered into a settlement agreement and released all of their individual claims for damages, attorneys' fees, and costs against defendants. And if we contrast that with what happened here, you know, if we look at the joint proposed scheduling order that we submitted to the district court, we didn't release our claims at all. We didn't say that we were withdrawing them. We didn't say we were releasing them. What we said was, let's have a process that moves this case. But what part of the relief sought and the complaint did you not get other than fees and costs? We did ultimately, our clients ultimately got adjudicated. That's correct. But it wasn't because of the agreement that we reached. It was because the state's action that it took. Again, if we look at what the state says the agreement was. But, I mean, this kind of gets into this whole picking off thing, which, you know, strikes me as a pejorative way of making people whole. I mean, which seems like a better way of thinking about it. The idea is right of access to the courts and to have injuries remedied. And it may be true there are some class action settings where it really is highly manipulative and maybe the Supreme Court needs to make an exception. I'm not sure I see this as one of them. I mean, these are real problems. People need the benefits. And if you identify the people and the state's willing to provide them the relief, I find myself saying just get a 1-800 number and get these people their benefits. And if the position of the state is we'll, quote, keep picking them off and keep mooting it, you're going to get attorneys fees in every single one of those claims. I just don't understand what's so bad about it. Judge Sutton, if they were agreeing to set up a 1-800 number that any individual who had this problem would get help, we would have taken that offer. What they told us instead was that they would handle not more than 100 individuals through this process. I'm going back to the picking off point. Yes, Judge. The premise of the picking off point is there's something terrible and mischievous about identifying people that are going to be the name plaintiffs, and then they, quote, pick them off so you can't get your class. And it would seem to me if you have access to the names of these people, next time around you just put as many of them as you can in this, quote, name plaintiffs, identify the rest of them for the court, and say, listen, if they're going to pick them off, these people are going to stand in their place, and they're either going to say we're going to give them all the benefits, or they're going to say, no, we're not because there's a true legal issue and we do need to have this certified and resolved once and for all. Judge, I think there are two responses. And, again, so first of all, let me acknowledge. Picking off, I think that's a terrible name for what we're talking about. But what your court is talking about in the Blankenship decision and then reaffirmed in Brunette and reaffirmed in Carroll is a situation like this, where the state steps forward and says, or the defendant steps forward and says, that they will voluntarily cease the illegal practice complained of in the particular instance, but not with respect to the other applicants. And we don't know the names of everyone. Again, I referenced the number of 100, and there was a question before of, well, how many people are there and is this still going on? You know, when the briefing closed in this case, we didn't have anything in the record that gave a definitive number. But the state has submitted a declaration to the district court post-briefing in this case. It's at Record Entry 105-2 at page 1540, where they state that more than 10,000 individuals have been going through the preliminary injunction process that was created by the district court. So the real problem in the picking-off scenario is that if you name five people and the state gives the benefit to those five, you then have to name more people and more people. You have to do the discovery of essentially the membership of the class at that early stage without getting the protection of a preliminary injunction and other relief. That's right, Judge Moore, and it's not even clear that we would get discovery. If we were moot, then the case would end at that point. And the critical thing I think here and the concern in Blankenship and in this court's cases is that that would defeat the Rule 23 mechanism because of the inherent... You can't use John Doe's in class. You cannot use a John Doe because how can you decide whether this anonymous person or unidentified person is a worthy representative of the class? So I guess that never works, does it? I don't think we could use a John Doe in reference to the state and not disclosing their information because, of course, they have to be able to assess the validity of that. We did use initials in this case to protect minors from the public, but not, of course, from the state. We immediately told them who they were. What about the inherently transitory exception? And your opponent argues that that's not applicable here because of the timing issues. I think that they're measuring it from the wrong moment. And I think that the closest case that's relevant to this, that the state acknowledges in their brief as well, it would be an inherently transitory circumstance, is the Second Circuit's decision in Robodeau. There it was people applying for public benefits where there was a 30-day period of time where they were supposed to get their decisions. And the Second Circuit easily was able to conclude, well, 30 days, it's at least reasonable to conclude that once the state knows who it is that's coming forward, that they'll get a prompt decision. And here, of course, we have 45 days instead of 30. I don't understand how the 45 and 90 make it transitory. The claim arises after you've missed that timetable, and that injury stays until you win the case or they consent by giving them the benefit. I agree with that. That's why it's inherently transitory, the inherent part. But it's a reference point because it shows that if the statutory framework envisions that no case should ever take more than 45 days, it's, of course, reasonable to conclude that they'll be able to be processed quickly. And I think this goes back to your concern about the pejorative nature of picking off. I don't think it has to be viewed as pejorative. We would hope that when the state learns, whether through a lawsuit or otherwise, that someone is alleging that they have been beyond the statutory period, their rights are being violated, they haven't been given due process, the state would look into that and make its own assessment. Do they think that this is right or not? If they think it's right, then they hopefully would go the next step and say, okay, well, then we're going to try to provide a solution here. That's what was happening in Blankenship. The credible version, the non-pejorative version, is what happened here. They said we'd help these individuals because they're claiming that they have a problem. But, again, they capped it at 100. They said that we won't be able to help anymore. And this is why the 800 number is relevant. If they had said we'd be able to help everyone through this process and we guarantee that we would give them a prompt decision, that would have been a very different circumstance and would have taken us out of the concern. Why don't you set up a 1-800 number? I realize that that's costly, but, I mean, eventually you'd get that recouped if you won. Well, because we don't know every one of the class members. I mean, if we knew them. I mean, I was just in advertisements. I mean, lawyers advertise all the time. That would be recoupable money. You advertise a 1-800 number. Are you being denied these benefits? Here are the types of people that this might apply to. And who would you have them call? Would you have them call the state? Call them. Their problem is they don't know the names. Isn't that your problem? If you knew the names, you would just put them all in the suit. That's one of the problems. But whether or not, I mean, look, Judge, will we be able to What percentage of the names do you know? Well, the class is continually evolving, right? So you only get into the class after you've been delayed beyond the statutory period. So I know the names of 20,000 individuals, because I've been given it from the state through discovery, of people who are going through the process. But it's not clear they were denied 45, 90 days. Well, you're right, Judge. I mean, they still have to be adjudicated. They're claiming that they've been denied, of course, as part of that process of getting into the process. So there might be some error on that, right? But I don't know who's going to be in the class tomorrow, because tomorrow there's going to be another set of people who are going to go beyond that 45-day mark who are then going to be in that situation. So we'd have to do a continual process. But, look, if we had set that up, the state is contending that the whole case should have been moot. I think your premise is that this would have resolved the problem. But if we're moot and out, then we are bearing those costs, right? If you're what? I didn't hear what you said. Your last sentence was what? If we are moot, because if we don't have an exception to the Rule 23 to allow the Rule 23 mechanism to work in the contours of this case. You're not out. You get your fees, because you would have gotten relief. You know, Judge, well, yeah, only if we got a court-ordered sanction or an agreement. Okay, that's that West Virginia Buckhannon case. Right. That would be the debate. It's not clear how it comes out, right? Well, I don't want to be on the wrong side of that debate. But the critical thing for us is that, I mean, we're not in this for attorneys' fees. We're in this to get our clients' coverage, that they're being denied. And, I mean, this is the critical thing, again, when we look at Petri. The big problem would be, if this was the end of the case, the hundred people or so would have received the benefit, and arguably you might get attorney's fees. But what about all the other members of the class? And the class has been certified so far and hasn't been appealed. Right. I want to make sure I understand this. You can't just add new . . . because the argument is that it's moot. Well, Judge White, I think we could. And if this court found that we were moot, the appropriate relief would be to remand it back so that we could add in a new class member. And we certainly could do that. But this gets to the inherently short-term nature. I'm not talking about inherently transitory, but the inherently short-term nature of the individual stake that anyone would have in these cases, just like in Blankenship and just like here. The only relief that a person . . . Short-term nature doesn't refer to how long it takes for them to pay them off. No, no, it doesn't. But I'm saying that it would entirely defeat the Rule 23 mechanism, where everyone is . . . the minute that we get a determination, our client's interest in the case, right, technically is over. The minute in Blankenship that they got the hearing, their interest in the case was over. And so it's precisely in that context, where no one's interest is going to last particularly long, that it's appropriate to . . . So the scenario in which you can never have a class action . . . I mean, listen, I'm sounding skeptical, but I think this is very hard. But I'm just trying to continue at your point. The scenario in which you never get your class action is when, one after the other, you identify claimed plaintiffs, representatives, and they keep paying them off. So it ends disappointingly. I'm not being sarcastic with all 10,000 people getting relief. Now, I realize that's incredibly cumbersome, arguably ridiculous, but I'm also not . . . I'm sure I'm understanding why . . . how bad that is. Because what ended up happening was you stopped being able to identify named plaintiffs only because every single person that could be a named plaintiff had gotten the benefit. How is that terrible? If we had perfect information where we had the names of every person, then I think that you're right. The end result could have been the same. But, in fact, what we have here is a process, right? The state has stated repeatedly . . . You have 20,000 names. 20,000 names, yeah, of people who are going through the process. And the state has told us this isn't in the record. Well, this isn't in the record. No state is going to do what I said because the fees are going to bankrupt them. I mean, because it doesn't really make sense from their perspective either, which is kind of a puzzle for me why this case is the way it is. But the critical thing is that they have set up a process where every person who calls in now and says, I'm still delayed, I'm still having a problem, they now treat that to their credit. They now treat that as a delay hearing request under the Wilson case and they move them into this new process, which is great. That's what we want because that means that people are getting the relief that they need and we don't have to be doing advertisements and we don't have to be having people reading the newspaper. These are low-income individuals who are not going to be . . . I have no way of guaranteeing that I'm going to be able to find them. What I am fairly confident of is they're going to keep calling TennCare because they haven't gotten a decision. And by putting it there through the preliminary injunction, that they're now doing that, that's what's allowing the class action mechanism to achieve the broad relief that we want that I have no confidence that I could do without the Rule 23 mechanism being available to me. Okay, so what . . . If we say that it's moot, what do you think will happen? Well, Judge, if you said that it was moot, you would have two choices. The state asks that you would dismiss the case entirely and that we would have to start over and that we would have to file a new complaint with new clients. And then we'd be in the situation that Judge Sutton is referring to, that we would be filing a new case. They would learn of the new person who claims that they're delayed and I hope they would do the right thing and process that person because their statutory and constitutional rights are being violated. And we'd be repeating that in that cycle. The other alternative, if you found that we were moot, is that you would remand with directions to permit time to substitute in a new class member. The problem with that solution is, and what Blankenship recognized, is that if you do that, they're going to quickly become moot, too. I mean, I guess the benefit is now the class has been certified so then we're clearly protected in that context. So, okay, if that's . . . I'm not . . . I guess we'll find out from them if they agree that that would be possible. But I just have another question. So much of this depends upon the timing of the class certification. Is it relevant that they didn't appeal that? Well, I think it is but it isn't. We're not contesting that the issue of mootness is a subject matter jurisdiction issue. I mean, that's the challenge, right? I mean, the class certification order was clearly proper and appropriate in terms of all of the . . . well, let me rephrase that. It's not on appeal whether or not the class certification order was proper in terms of whether all the requirements of 23A were satisfied. But we take the state's point that mootness is an issue of subject matter jurisdiction and so it is proper to be asking these questions of, well, were you in fact moot? We don't . . . I don't have issue with them raising it in the way that they have here. You said something in response to . . . I think it was Judge White that I hadn't quite worked through and I just wondered if any cases had dealt with what you just suggested, which is, well, of course, class certification happened after the alleged mootness and we know if it had been reversed, you'd be fine, right? But it did happen after and you were saying one possibility is somehow there's some mechanism you seem to be suggesting where because the class certification order has not been appealed, it's still lingering out there even though the underlying case is moot. The district court would have time to substitute a new class member and that seemed to suggest to me because that then gets you on the other side of that problem. Is there a case that's endorsed or blessed this idea? We've cited . . . I don't have it on the top of my head. I apologize, but we do cite cases in our brief that say that the appropriate . . . in a footnote that the appropriate relief, if you did find that we were moot, would be to remand back and we cite you to authority for that. But to remand to correct the problem, but correct it in a way that prohibits, quote, picking off is what you seem to be suggesting. It would remand to permit us to substitute in a new class representative and there is case law to support that. I apologize, I don't have it off the top of my head. But then there could be the picking off. At that point, it's already been certified. Right. It depends on how it would be done and especially if the district court says we have 30 days to substitute in a new person, then we immediately . . . we substitute in the new person before the state has a . . . again, the pejorative nature of it, before the state resolves their case, they're substituted in automatically the minute that we file it, then yeah, we would get around that mechanism. But again, it's an odd and cumbersome way to do it and why I think the court in Blankenship, this court, said you don't need to do that. We instead just relate back the class certification order to the filing of the complaint because, again, every person, the minute that they get the determination, their interest effectively is resolved even though we know that there's still . . . The relation back is kind of an equitable doctrine and Bowles v. Russell suggests that equitable doctrines don't have a lot of application in subject matter jurisdiction disputes. Well, it's true. Judge Sutton, I recognize the tension with Article 3, right, and this context. But the cases that the Sixth Circuit has used, and it's not just Blankenship, it's also Brunette, it's also Carroll, those are still good law and binding on this court. I mean, the state cites to Genesis to say that, well, maybe that's been called into question, but the district court properly recognized in the class certification order that that was a felicitative collective action and the Supreme Court said, well, that's fundamentally different. So these cases are still good precedent and still binding here. Is the state providing the relief that you want currently? That's an interesting question. It's not complete relief, no. And we are continuing to see individuals who are still going beyond the 45 days, notwithstanding the fact that the federal government is giving them all the information. They have told us in deposition that they're still getting 100 cases a day where people are delayed. So there's still problems that are happening. This is creating a baseline safety net, and thus far that has satisfied us. But if those things don't get worked out, then it is possible that we might need different relief later on, and we might ask the district court for that. Thank you. You're very welcome. Thank you for your time. Thank you, Your Honor. I'd like to start with Judge White's question about what would happen if you find the case moot. And I want to follow my brother's lead and divide it into two categories. First, he suggested that you might somehow remand it back for the appointment of somebody new who has a live claim. Three reasons why you can't do that. Number one, the Brunette case, which we cite, is crystal clear in saying that when the, from this court, and they've cited no cases from this court on this point, when the case becomes moot before class certification, dismissal is required. Second reason you shouldn't do that. The facts on the ground have changed enormously since the district court heard this last summer. If a new case comes along, and that's a big if, given the changes, but if a new case came along, the facts would be night and day different, and the case ought to be litigated on the facts as they exist now, not the moot facts from the named plaintiffs from a year ago. The third point, and it's a prudential one, and it kind of dovetails with the second, because the facts have changed so much, and this goes into the second part of your question, Judge White, we think the much more likely outcome, and I'm sorry, there's one other point. In the few cases that courts have done this, other courts have sent it back, it's always been because there was somebody who had raised his hand and saying, I have a claim, I still have a claim, so far no one's done that. Maybe they will find such a person, maybe they won't. We don't know if that exists. You're saying there's nobody out there that's waited? It's a fluid situation, Judge White, because since the time the district court ruled, the state started receiving information from CMS about these claims. It put in place a new process that did not and could not have existed last summer that allows the state to take the application information from CMS, contact the applicant, and resolve their claim. It is very possible that there won't be anyone. Let's say that's right, but the proposition of law you want us to adopt does require us to contemplate this other scenario, another scenario where it's the so-called picking off nightmare, where it's just you pick off the 10, mooted, they don't even get fees, we'll just say for the sake to make it a harder question, and then they find 10 more, and it just keeps going on and on. That seems really strange. Let me address that, Your Honor. Assuming the picking off doctrine, let's assume it's still good law. I'm not even using it as a doctrine. I'm describing what the state, I'm doing it pejoratively, I'm attributing bad motives to the state or whoever the defendant is, but they just keep doing it. They keep mooting the case so you can't have your class action. That's not possible in this case, and let me tell you why. In order for the state to moot an applicant's claim, two things must happen. Number one, the state must learn of the application, and it must get the data from CMS. Let's say that happens. Even then, the state cannot unilaterally moot the case because what's giving rise to these problems in the first place is that the Federal Exchange can't deal with situations when the IRS's data on someone's income is inconsistent with what they said on their application, and so what has to happen is somebody has to ask the applicant, okay, the IRS says you made a lot more money last year, what happened? Now, maybe they lost their job this year, but they have to put in pay stubs and so forth. They have to provide information. If they've got somebody who doesn't want his claim mooted, all they have to do is not provide the information. The state lacks the ability to unilaterally moot these cases. The reason all of these cases get mooted is by the parties working together to solve the problem. An individual can refuse to provide information and still insist on being covered? They can slow down the process long enough for it to get certified, which goes back to the Genesis case, and if we had a situation, my colleague mentioned the Carroll case. That's the kind of manipulation where courts have raised this concern. In that case, and I would encourage the court to look at 399F3 at page 625, where the court adopted one of these picking-off type rationales. What it took in that case was this. It was a money case, and the defendant made an offer to pay off the named plaintiffs, and the defendant went further and made an offer to pay off the entire class. But it made the second part of the offer contingent upon the class being certified. By the time it made this offer, there had been a magistrate recommendation that certification be granted. So then the defendant turned around and said, well, certification can't be granted because the named plaintiffs have accepted complete relief, and so we don't have to pay off the whole class. That's what these cases are about, not a situation like this where A, the state can't do it unilaterally, B, the state is moving forward with the system to solve the greater problem. I guess forget about ill motive. You have a situation where, I don't know, 20,000 people have not gotten hearings. They're delayed. In response to an action, the court set up a system, and people are getting their claims entertained now. They're at least getting a hearing. That's partially true but partially not true, Your Honor. There's two systems. Right, and I was going to say, in addition, you also have a system that you're implementing voluntarily that is dealing with, I don't know whether it's old claims or new claims. All claims, old, new, you name it. Okay. It's dealing with everything. But in the meantime, you still have all of these people, right, who have not gotten hearings. All of the people, there is no in the meantime. All of the people involved are getting resolved through what we'll call the state's system. The system set up by the injunction is effectively just a backup system that allows them to get a hearing if our system doesn't solve their problem. And here's the problem with that from our perspective. The apparatus associated with the appeal system required by the injunction is quite costly in terms of money and in terms of human resources because you have to send all kinds of notices. You have to make all kinds of scheduled hearings. You have to do all sorts of things. And as a practical matter, what's happened is there hasn't been a single hearing as required by the injunction because the new state system that it was able to put into place after the judge ruled is taking care of all of the cases. Now, there's been problems . . . We've gone way over . . . I apologize, Your Honor. But if I could say something . . . Yes, Your Honor. Speaking for myself, it seems to me that this case is crying out for a settlement as opposed to wasting a lot of your money on both sides on litigating these issues. So I just throw that out as an observation. We appreciate the arguments that both of you have made. And I emphasize I'm just throwing that out as an idea of my own, not speaking for the whole Court. And on behalf of the state, let me respond to that, Your Honor. The state would be very open to any settlement that resulted in the vacature of the injunction. The state, as a matter of policy, is committed to continuing the process that it's put into place for dealing with that. And if that could be a basis for the settlement, that the injunction's vacated and the case is dismissed with the understanding the state system would go forward, we're open to that. And I'm sure the other side would have another statement that would say, If only you would do this, then we would be happy to join. So maybe the two of you can, because you both seem to be very reasonable people in your arguments today, that maybe the two of you can get together. But if not, we are certainly happy to go ahead and decide this case as we best can. And we appreciate the arguments that you all have made. It's an obviously interesting and difficult case. So thank you very much. Thank you, Your Honor. Will the clerk call the next case, please?